## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **JEFFREY DAVIS, on Behalf of Himself and All Others Similarly Situated,** | § § § | |
| **Plaintiff,** | § § | |
| **V.** | § § | **CIVIL ACTION NO. 3:17-CV-03236-G** |
| **CAPITAL ONE HOME LOANS LLC and CAPITAL ONE NATIONAL ASSOCIATION,** | § § § § | |
| **Defendants.** | § § | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR NOTICE AND FLSA CONDITIONAL CERTIFICATION AND BRIEF IN SUPPORT

Defendants Capital One Home Loans LLC ("COHL") and Capital One National Association ("Capital One, N.A." or "Capital One"), by counsel and pursuant to the Court's March 6, 2018 Order, submit this Opposition to Plaintiff Jeffrey Davis' ("Plaintiff" or "Davis") Motion for Notice and FLSA Conditional Certification (Dkt. 30).[1]

## I.      INTRODUCTION

Plaintiff's Motion treats the conditional certification process as a "drive-by" fait accompli. It is not.  At the very least, Plaintiff bears the important burden of demonstrating that certification will serve the interests of judicial economy.  To do that, he must show that he and the group he seeks to represent are "similarly situated" in that they worked in similar factual and employment settings and were together victims of a single decision, policy, or plan.  Plaintiff fails to meet that burden.

---

[1] Defendant Capital One, N.A., was Plaintiff's sole employer.  Defendant COHL did not employ Plaintiff and is not a proper party.  At the appropriate time, Defendants will file a Federal Rule of Civil Procedure 21 motion to drop COHL from this lawsuit.

Plaintiff relies exclusively on eleven nearly identical, boilerplate declarations from himself and ten other former Capital One employees. These declarations do not and cannot meet Plaintiff's burden for conditional certification. Among other failings, they contain no evidence that the declarants possess personal knowledge of their conclusory and blatantly inaccurate statements. The declarants state, for example, that until July 2015, Capital One classified all loan officers as exempt. That is demonstrably false. Capital One classified a single type of loan officers as exempt, not the entire class Plaintiff seeks to represent. Equally fatal to Plaintiff's effort, the declarations do not allege any illegal decision, policy, or plan common to the putative class. Instead, each declaration merely states that unspecified "management" at Capital One somehow "discouraged" (in some unspecified way) the declarant from reporting, at some unspecified time during the declarant's employment, some unspecified amount of overtime hours, for some unspecified reason. Even taking each declarant's vague, conclusory, and factually-unsupported statement as true, they do no more than allege individualized occurrences with no thread to tie them together.

Ultimately, Capital One's undisputed policy and practice requiring that all FLSA non-exempt employees accurately record and be paid for all time worked constitutes the only common thread among the putative class, and the only evidence in the record regarding any companywide policy. Otherwise, the members of the putative collective differ significantly from each other. For example:

- A significant number of the putative class, including current opt-in plaintiffs Deanne "D" Baron ("Baron"), Christopher Lunn ("Lunn"), Nicholas McKinney ("McKinney"), Eric Rounds ("Rounds"), and Justin Silberman ("Silberman") entered into binding and enforceable severance agreements in which they waived their ability to participate in collective actions;

- The different types of loan officers worked in very different work environments (e.g., inside sales versus outside sales), had significantly different pay procedures at different times (e.g., exempt versus non-exempt), and even reported to entirely different management and leadership within Capital One;

2

- The compensation plans for the putative class and their supervisors did not factor in labor costs in any way and therefore actually incentivized the putative class to report and be paid for overtime hours; and

- Members of the putative class, including Plaintiff and several of the declarants, regularly reported and were paid for extensive overtime, sometimes even exceeding twenty hours of overtime in a week.

For these reasons and the reasons stated below, conditional certification is not appropriate, and Plaintiff's motion should be denied.

## II.   STATEMENT OF FACTS

Plaintiff's Motion for Notice and FLSA Conditional Certification and Brief in Support ("Plaintiff's Motion") relies exclusively on eleven nearly-identical, conclusory and vague declarations signed by him and ten other former Capital One employees. As detailed below, Plaintiff's cookie-cutter declarations do not provide the personal knowledge or specifics necessary to demonstrate the realities of his work environment, or to satisfy his burden of proving the existence of a community of similarly-situated employees.

### A.   Capital One's "LOs," Divided Between "Inside Sales" and "Outside Sales," Did Not Have the Same Job Duties or Work Environments

At all times relevant to this lawsuit, Capital One originated and serviced home loans. Complaint ¶ 31; Answer ¶ 31.  In November 2017, before this lawsuit was filed, Capital One announced that it was closing its home loans business.  Complaint ¶ 15; Answer ¶ 15.

Contrary to Plaintiff's lumping of "all LOs" into one group, Capital One's Mortgage Sales and Originations ("Mortgage Sales") employed two distinct, very different types of mortgage salespeople with different job titles, locations, positions, and work environments:  Distributed Mortgage Loan Officers ("MLOs") in "outside sales" positions, and Centralized Mortgage Loan

Officers ("CLOs") in "inside sales" positions.  Declaration of David Dickey, attached hereto as Exhibit A ("Dickey Decl.") ¶ 4.

       1.     <u>MLOs Exercised Significant Discretion and Were Loosely Supervised</u>

Plaintiff and nine of the ten other declarants worked exclusively as MLOs.  In hiring MLOs, Capital One generally required candidates to have extensive mortgage sales experience.  Dickey Decl. ¶ 8.  Indeed, MLOs were expected to bring their own book of business and customers to Capital One, as well as the skills and experience necessary to continue to develop sales leads in an autonomous fashion once working for Capital One.  *Id.*

Given their experience level, MLOs were afforded a broad degree of autonomy in terms of where, when, and how they got their work done.  *Id.* ¶ 14; Declaration of Frank Laudwig, attached hereto as Exhibit B ("Laudwig Decl.") ¶¶ 4–5; Declaration of Bruce Nohe, attached hereto as Exhibit C ("Nohe Decl.") ¶ 7; Declaration of Jeff Macy, attached hereto as Exhibit D ("Macy Decl.") ¶ 5.  Most MLOs worked remotely.  Dickey Decl. ¶ 13; Laudwig Decl. ¶ 3; Nohe Decl. ¶ 6.  Before July 2015, MLOs were assigned to a Capital One office or branch for administrative purposes (e.g., payroll) and to give them access to office resources (e.g., client meeting space) if needed, but they were not required or expected to be physically present at any Capital One location.  Dickey Decl. ¶ 11; Laudwig Decl. ¶ 3; Nohe Decl. ¶ 6; Macy Decl. ¶ 3.  Instead, most MLOs worked from home or from locations of their choosing and spent significant time visiting and networking with customers, potential customers, and referral sources.  Dickey Decl. ¶ 11.

In addition, Capital One did not set work schedules or hours for MLOs.  Rather, MLOs were permitted to determine the schedule, and to work the hours, that they determined made the most sense for them and their clients or prospective clients.  *Id.* ¶ 14; Laudwig Decl. ¶ 4; Macy Decl. ¶ 4.  To facilitate that discretion and autonomy, Capital One issued MLOs laptops and smart

phones.  Dickey Decl. ¶ 11.  MLOs also were expected to develop their own sales and marketing strategy and received a business expense allowance of $250 per month.  *Id*. ¶¶ 9-10; Nohe Decl. ¶ 5.  If their expenses exceeded $250 in any given month, MLOs could request approval for additional expenses.  Nohe Decl. ¶ 5.

MLOs were supervised, at any given time, by anywhere from eight (8) to fifteen (15) different Area Sales Managers ("ASMs").  Dickey Decl. ¶ 15.  ASMs exercised considerable discretion in terms of how they managed their MLOs.  *Id*. ¶ 19; Laudwig Decl. ¶ 6; Nohe Decl. ¶ 8; Macy Decl. ¶ 5.  For example, some ASMs checked in with their MLOs at least once a day during the work week, usually by phone or email.  Nohe Decl. ¶ 7; Macy Decl. ¶ 5.  Others took an even more hands-off approach and generally only spoke with their MLOs when called upon to answer questions or assist in loan transactions.  Dickey Decl. ¶ 17.  Since MLOs did not regularly visit a Capital One office or location, they had relatively little in-person interaction with their assigned ASM.  *Id*. ¶ 16; Nohe Decl. ¶ 7; Laudwig Decl. ¶ 5.  In fact, some ASMs supervised MLOs who lived and worked in different parts of the country.  Dickey Decl. ¶ 16.

In July 2015, Capital One introduced a new sales initiative (the "Bank Mortgage Sales Model") to help MLOs generate more leads by partnering them with Capital One branches and giving them "branch hours," or hours during the work week when they would be physically present in a branch and interacting with existing Capital One customers.  Declaration of Michael Jordan, attached hereto as Exhibit E ("Jordan Decl.") ¶ 6.  The "branch hours" varied depending on the individual bank branch and the individual MLO, but most MLOs were expected to be present at the branch for approximately four to six hours per week.  *Id*. ¶ 7; Dickey Decl. ¶ 12.  Other than that, MLO job duties did not change and they retained a great deal of discretion over when, where, and how they got their work done.  Dickey Decl. ¶¶ 13–14.  In addition, MLOs retained the

5

freedom and discretion to determine whether the "branch hours" were a productive and efficient use of their time.  *Id*. ¶ 12.  If they were not, the MLO was permitted to make necessary adjustments, including eliminating branch hours from his or her schedule.  *Id*.

Prior to the rollout of the Bank Mortgage Sales Model, Capital One classified MLOs as FLSA-exempt outside salespeople.  Jordan Decl. ¶ 5; Khan Decl. ¶ 5.  Because the Bank Mortgage Sales Model required MLOs to be physically present in a fixed location for part of their work week, Capital One decided, out of an abundance of caution, to reclassify MLOs at FLSA non-exempt.  Jordan Decl. ¶ 8.  This decision was made notwithstanding the fact that MLOs continued, even after July 2015, to function as outsides salespeople.  Dickey Decl. ¶ 13.

After the reclassification from exempt to non-exempt, Capital One required ASMs to approve timesheets on a weekly basis and to ensure that their MLOs reported and were paid for all hours worked.  *Id*. ¶ 20.  Consistent with the discretion they exercised in other areas, some ASMs required MLOs to request authorization or pre-approval for overtime hours over a certain threshold, and others had no such requirement.  Nohe Decl. ¶¶ 10, 12; Laudwig Decl. ¶ 10; Macy Decl. ¶ 10.

2.    CLOs Worked in a Call Center Environment with Close Supervision

CLOs had different job duties and work environments than MLOs.  Dickey Decl. ¶ 4.  CLOs were responsible for "inside sales" and worked in one of two Capital One office locations in Plano, Texas and Wilmington, Delaware.  *Id*. ¶ 23.   In stark contrast to MLOs, CLOs were required to be physically present at the office for all their work hours.  *Id*. ¶ 24.  Remote work was prohibited.  *Id.*

CLOs' work environment resembled a call center, including an open floor plan, office "cubicles" with low walls, desktop computers, and stationary phones.  *Id*. ¶ 24.   CLOs were

expected to show up to work at the same time each day, log into their work stations, take scheduled breaks, and log out of their work stations at the end of the work day. *Id.* ¶ 25. They were not permitted to make phone calls to customers or prospective customers outside of the office. *Id.* ¶ 28.

Another key difference between MLOs and CLOs is that CLOs were given very little discretion in how they conducted their work. In fact, they were neither expected nor required to generate their own business leads. *Id.* ¶ 27. Capital One generated leads for them, and they merely followed up on the leads by phone and email. *Id.* CLOs did not leave the office to meet with customers or prospective customers in person, and Capital One did not provide them with a monthly allowance for business development costs. *Id.* ¶¶ 27, 30.

Finally, CLOs were closely supervised by Centralized Sales Managers ("CSMs") who were physically present on the sales floor at all times during the workday. As such, the three CSMs in Plano, Texas, and the one CSM in Wilmington, Delaware had daily, personal interactions with their CLOs. *Id.* ¶ 30. CSMs were responsible for ensuring that CLOs reported and were paid for all hours worked. CSMs were also responsible for authorizing overtime if a CLO needed or wanted extra time at the beginning or end of a shift to complete his or her work. *Id.* ¶ 31.

3. <u>Home Equity</u>

Plaintiff's proposed class is so broadly defined that it could conceivably include individuals employed by Capital One in an entirely separate sales organization that originated and serviced home equity loans and lines of credit ("Home Equity Sales"). Home Equity Sales sold a different portfolio of products and had a completely different reporting structure within Capital One. Dickey Decl. ¶ 5; Declaration of Abhijit Joshi, attached hereto as Exhibit F ("Joshi Decl.") ¶ 2.

To date, no individuals who were employed in Home Equity Sales have opted-in to this lawsuit.

**B.**     **Capital One Did Not Pay MLOs and CLOs Similarly**

Contrary to Plaintiff's allegations, Capital One did not pay MLOs and CLOs similarly. Before July 5, 2015, MLOs were classified as FLSA exempt and were not eligible for overtime. Jordan Decl. ¶ 5; Declaration of Azim Khan, attached hereto as Exhibit G ("Khan Decl.") ¶ 5. During this time, MLOs received a non-recoverable draw against commissions of $1846 per month.   Khan Decl. ¶ 5.  Because the draw was non-recoverable, MLOs' compensation was the equivalent of salary plus commissions.  *Id.*

On July 5, 2015, Capital One reclassified MLOs as non-exempt in connection with the new requirement that they spend part of their work week in a Capital One branch.  Jordan Decl. ¶ 6, 8. On and after July 5, 2015, MLOs received the following compensation:  (1) an hourly rate of no less than $11.53 per hour; (2) one-and-one-half times the regular rate for all time worked over forty (40) hours per week; (3) incentive pay; and (4) additional overtime pay once the regular rate was adjusted to include incentive and other variable pay.  Khan Decl. ¶ 6.   The hourly pay for MLOs was never treated as a "draw" or "advance."  *Id*. ¶ 7.  Rather, it was the employee's base pay.  *Id*. ¶ 7.  As such, a MLO's hourly pay was never deducted from any incentive pay as one might expect to see in a "draw against commission" compensation plan.  *Id*. ¶ 7.

In contrast to MLOs, CLOs were <u>never</u> classified or treated as FLSA exempt employees. *Id*. ¶ 6.  Before September 27, 2015, CLOs received the following compensation:  (1) an hourly rate of no less than $8.65 per hour; (2) one-and-one-half times the regular rate for all time worked over forty (40) hours per week; (3) incentive pay; and (4) additional overtime pay once the regular rate was adjusted to include incentive and other variable pay.  *Id*. ¶ 7.  On and after September 27,

2015, the hourly rate increased to no less than $10.10 per hour and everything else stayed the same. *Id.* ¶ 8.  Moreover, the hourly pay for CLOs was never treated as a "draw" or "advance."  *Id.* ¶ 9. Rather, it was the CLO's base pay.  *Id.* ¶ 9.  As such, a CLO's hourly pay was never deducted from any incentive pay as one might expect to see in a "draw against commission" compensation plan.  *Id.* ¶ 9.

In addition to the discrepancy in FLSA exemption status prior to July 5, 2015, MLOs and CLOs were not ever eligible for the same incentive pay plans.  *Id.* ¶ 8.  Importantly, however, Capital One's profits and losses (including labor costs) were not in any way factored into the calculation of incentive pay for either MLOs or CLOs.  *Id.* ¶ 9.  In other words, the compensation plans did not incentivize off-the-clock work.  *Id.* ¶ 10.  In fact, they did the opposite.  The more hours a MLO (on or after July 15, 2015) or CLO recorded over forty (40) hours per week, the more he or she was paid in that pay period, regardless of whether those hours were "productive" hours from the standpoint of generating sales.  *Id.* ¶ 10.  Likewise, Capital One's profits and losses (including labor costs) were not in any way factored into the calculation of incentive pay for ASMs and CSMs, meaning that the individuals managing MLOs and CLOs were not incentivized to focus on labor costs.  *Id.* ¶ 11.

## C.     Capital One Prohibits Off-the-Clock Work

Capital One expressly prohibits off-the-clock work and requires that non-exempt employees accurately record all time worked in the Company's timekeeping system on a daily basis.  *Capital One Code of Business Conduct at Ethics*, attached hereto as Exhibit E-3 ("*Code of Conduct*") at 7; *Non-Exempt Time Tracking Guidelines*, attached hereto as Exhibit E-2 ("*Time Tracking Guidelines*") at 3; *see also* Jordan Decl. ¶¶ 16, 24.  Capital One further requires that non-

exempt employees be paid for all hours worked in accordance with federal and state wage and hours laws. *Code of Conduct* at 3; *Time Tracking Guidelines* at 3.

Capital One's Non-Exempt Time Tracking Guidelines, which are distributed to all non-exempt employees and prominently posted on the Company's intranet, provide a detailed, comprehensive, and easy-to-understand explanation of the Company's policies and expectations as they relate to tracking time. *See generally Time Tracking Guidelines*. Among other things, the Guidelines state:

- "All time worked will be paid."

- "In order to be paid, associates must enter all time worked in . . . the official time tracking system of record. Failure to do so is grounds for disciplinary action, including termination."

- "Start and stop times should reflect when associates actually begin and end work, not the hours they are scheduled to work. Time cards should not be pre-populated. As a best practice, associates should enter their time daily."

- "Unapproved working time can be grounds for disciplinary action, including termination. However, regardless of whether such time is approved, it must be recorded and paid."

*Time Tracking Guidelines* at 3–4. The Guidelines emphasize and reiterate the importance of recording all time worked through a non-exhaustive list of situations that require timekeeping action on the part of the employee:

- "You spend approximately 30 minutes outside of your normal work hours completing tasks and preparing for the next day's work. Enter 30 minutes into the system as time worked."

- "You routinely check your BlackBerry from home several times a night and spend approximately 15 minutes total checking and responding to emails. Keep track of all the time you spend checking your BlackBerry and record it as time worked."

- "You arrive at work 10 minutes before your scheduled shift, and you spend those 10 minutes logging into your computer and reading emails to prepare for the day. Enter those 10 minutes into the system as time worked."

*Id.* at 6.

In addition to providing these Guidelines, Capital One conducts new-hire training for all non-exempt employees on its "on-the-clock" policies and practices and how to use its timekeeping system.   Dickey Decl. ¶ 32; Laudwig Decl. ¶¶ 7–8; Nohe Decl. ¶¶ 9–11; Macy Decl. ¶¶ 7–8. CLOS and MLOs (on and after July 5, 2015) all received this training.  Dickey Decl. ¶ 32; Laudwig Decl. ¶ 8; Nohe Decl. ¶ 11; Macy ¶ 8.

MLOs and ASMs received training on Capital One's policies and practices when Capital One reclassified MLOs to non-exempt in July 2015.  Jordan Decl. ¶ 15.  On June 29, 2015, Capital One hosted a meeting for all ASMs to explain the changes. Id. ¶ 10.  In addition to explaining to ASMs that they would be responsible for approving weekly timesheets, Capital One leadership stressed the importance of MLOs recording all time worked.  Id.  The next day, on June 30, 2015, Capital One hosted mandatory meetings for all MLOs and gave a detailed presentation outlining the new job requirements and the FLSA status change.  *Id.* ¶ 11; *see also Sales Compensation Overview for Loan Officers, Home Loans Distributed Sales*, June 2015, attached hereto as Exhibit E-1 ("*FLSA Presentation*").

The presentation explained that MLOs would "continue to be focused on generating external sales," but that the new requirement to spend time in Capital One branches meant that they would now be eligible for overtime pay.  Jordan Decl. ¶ 12; *FLSA Presentation* at 4.  The presentation instructed MLOs to complete a computer-based training on Capital One's timekeeping system at the time, "TimeOne," and stated as follows:

> **Starting on July 5, you will <u>record each hour worked</u> in TimeOne and will be paid based on the hours recorded in the system.**
> - Track all time you spend working on Capital One activities, both on-site and other locations

- Start and stop times should reflect when associates actually begin and end work. Time cards should not be pre-populated. As a best practice, you should enter your time daily.
- You will need to comply with any state break requirement as specified in [Capital One's] Non-Exempt Time Tracking Guidelines.

*FLSA Presentation* at 6 (emphasis in original). The presentation included "examples" of "hours worked" that needed to be recorded in Capital One's timekeeping system. Created with the unique nature of MLOs' work in mind, the examples included a lunch appointment with a referral source and a golf outing with a real estate agent. Jordan Decl. ¶ 13, *FLSA Presentation* at 8.

In September 2015, several months after MLOs were reclassified from exempt to non-exempt, Capital One changed its timekeeping system from "TimeOne" to "Workday." Jordan Decl. ¶ 19. Prior to the system change, Capital One required all of its non-exempt employees—including MLOs and CLOs—to complete a computer-based training module with step-by-step instructions on how to enter time, record time, submit time for approval, and correct or amend time entries in Workday. *Id.* MLOs and CLOs used Workday from September 2015 until the close of the home loans business. When time was submitted for management approval in Workday, the MLO or CLO submitting his or her time was required to certify as follows: "I attest that I have accurately recorded all hours worked during this pay period." Jordan Decl. ¶ 23.

Corrections to time were permitted even after the MLO or CLO submitted time for a pay period and/or the employee's manager approved the time. Jordan Decl. ¶ 21. Managers were not permitted to adjust timesheets unless the entries did not reflect the hours the employee actually worked and the manager provided written documentation of the reason for the adjustment. Jordan Decl. ¶ 22.

**D.     MLOs and CLOs at Capital One Regularly Reported and Were Paid For Overtime**

It was not unusual for MLOs and CLOs to report overtime.  Nohe Decl. ¶ 13; Laudwig Decl. ¶ 9.   The amount of reported overtime varied considerably from MLO to MLO and from region to region.  In the New York region, for example, most MLOs reported some overtime each week and several MLOs regularly reported and were paid for more than sixty (60) hours per week, or twenty (20) hours of overtime.  Nohe Decl. ¶ 13.

The three ASMs who provided declarations in support of this lawsuit could not recall a single instance in which they rejected a timesheet because the MLO reported overtime, even if the overtime was unauthorized.  Laudwig Decl. ¶ 10; Nohe Decl. ¶ 12; Macy Decl. ¶ 10.

**E.     Approximately 202 Members of Plaintiff's Proposed Class Have Signed Class Waiver Agreements**

Capital One, as a matter of course, offers severance agreements to employees whose employment is terminated without cause.  Declaration of Robert Beardslee, attached hereto as Exhibit H ("Beardslee Decl.") ¶ 13.  Approximately 202 members of Plaintiff's proposed class—including five current opt-ins—executed Capital One's standard severance agreement, which states in relevant part:

> **Class or Collective Actions and Multi-Party Litigation Claims.**
>
> If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any Released Parties is a party.

Beardslee Decl. ¶¶ 3–12.

## III.     ARGUMENT

Plaintiff's asks the Court to assist him in inviting an expansively-defined group of former

Capital One employees to opt into his lawsuit.  He, however, does not and cannot demonstrate that conditional certification would be in the interests of judicial economy or that he is "similarly situated" to the putative class he seeks to represent.  Consequently, the requested certification is not warranted and should be denied.

## A.    Legal Standard and Plaintiff's Burden of Proof

The Court's discretion to issue notice to putative class members in this case stems from the Supreme Court's holding in *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).  There, the Supreme Court held that district courts have the discretion to issue notice in "*appropriate cases*" if doing so would serve the interest of judicial economy.  *Id.* (emphasis added); *see also Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004).  Importantly, that discretion is not unlimited, and courts should avoid "stirring up" unwarranted litigation.  *Hoffmann-LaRoche*, 493 U.S. at 18*; see also Lentz v. Spanky's Rest. II, Inc.*, 491 F. Supp. 2d 663, 668-69 (N.D. Tex. 2007).    The question before this Court, then, is whether the present case is one where such notice is "appropriate."  As shown below, it is not.

To date, the Fifth Circuit has not endorsed a specific test courts must use when deciding whether to certify a collective action under Section 216(b).  Some courts within this district have followed the two-stage test set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), which contains an initial "notice" stage followed by a later "decertification" stage after discovery has been conducted.  *See e.g.*, *Songer v. Dillon Res., Inc.*, 569 F. Supp. 2d 703, 706 (N.D. Tex. 2008).  Others have followed the so-called "spurious class action" approach set forth in *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990). *See e.g.*, *Lentz*, 491 F. Supp. 2d at 668-69.  Plaintiff has urged this Court to follow the *Lusardi* approach.  *See Plaintiff's Motion* at 7-8, and fn. 2.  Ultimately, the test utilized does not matter because Plaintiff fails to meet his necessary burden under either test.

Under either standard, Plaintiff "bear[s] the burden of showing there are other employees 'similarly situated.'"  *Marshall v. Eyemasters of Texas, Ltd.*, 272 F.R.D. 447, 449 (N.D. Tex. 2011).  He "must make a minimal showing that (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist, (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) those individuals want to opt in to the lawsuit."  *Crane v. J&M Commc'ns, Inc.*, 2017 WL 2882593, at * 4 (N.D. Tex. July 6, 2017) (quoting *Prater v. Commerce Equities Mgmt. Co.*, 2007 WL 4146714, at *4 (S.D. Tex. Nov. 19, 2017) (internal quotations omitted)).  More specifically, Plaintiff must show that the he and the class he seeks to represent were subject to "a common policy or plan."  *See e.g.*, *Franklin v. HCA Mgmt. Servs., LP.*, 2016 WL 7744407, at *2 (N.D. Tex. Dec. 19, 2016); *Long v. BDP Int'l, Inc.,* 2013 WL 5052321, at *4 (S.D. Tex. Feb. 8, 2013) (cases cited therein).

Plaintiff's burden is real and important.  Conditional certification and notice should be denied "if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice."  *Franklin*, 2016 WL 7744407, at *2.  Indeed, as the Court explained in *Lentz*, requiring the plaintiff to prove his entitlement to certification and notice is necessary to avoid "stirring up unwarranted litigation" and to protect employers from being "unduly burdened by a frivolous fishing expedition conducted by the plaintiff at the employer's expenses." 491 F. Supp. 2d at 669.

Where a plaintiff attempts to meet his burden through affidavits, those affidavits cannot be mere "boilerplate" or "virtually identical" ones that "contain primarily conclusory allegations unsupported by any factual assertions demonstrating the basis of the affiants' knowledge."  *Songer*, 569 F. Supp. 2d at 705-07 (denying plaintiffs' motion for conditional certification).  Moreover, where such affidavits are offered as evidence of a common policy or practice applicable to all

would-be class members, they must "establish that the plaintiff[] ha[s] personal knowledge of those matters as they pertain to any other" employee. *Id.* at 707. And where, as here, the employer offers evidence showing differences between the situations of plaintiff and other would-be class members, the plaintiff must offer more than "conclusory allegations" to counter such evidence. *Lentz*, 491 F. Supp. 2d at 669 (denying plaintiffs' motion for conditional certification).

**B.  Plaintiff Fails to Meet His Burden**

       1.      <u>Plaintiff Is Not Similarly Situated to a Significant Portion of the Putative Collective Who Executed Valid and Enforceable Class Waivers</u>

Plaintiff does not demonstrate that he and the putative collective are similarly situated. As an initial matter, 202 members of the putative collective, including 5 of the current opt-in plaintiffs, have executed the same valid and binding class or collective action waiver. The relevant waiver, contained in Capital One's standard severance agreement, provides:

**Class or Collective Actions and Multi-Party Litigation Claims.**

If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

Beardslee Dec., Exhibits 1–5 at 3.

These waivers render notice to those who executed them inappropriate. Class waivers like Capital One's are valid and enforceable under Fifth Circuit law. *See Convergys Corp. v. N.L.R.B.*, 866 F.3d 635, 639–40 (5th Cir. 2017). As such, these waivers place the 202 people who executed them in a significantly different category than Plaintiff and other members of the putative class who are not subject to a class waiver. Accordingly, Capital One will be moving for summary judgment against the five current opt-in plaintiffs who executed the waiver. As the court noted in *Basco*, when considering whether to conditionally certify an FLSA class, courts should take care

16

to avoid "exercise[s] in futility and wasted resources for all parties involved."  2004 WL 1497709, at *5.  Unlike Plaintiff, these individuals elected to forego the right and ability to participate in a collective action.  Providing notice to them about a lawsuit in which they cannot participate would epitomize futility and wasted resources.

2.      Plaintiff's Declarations Do Not Justify Conditional Certification

Plaintiff relies exclusively on eleven virtually identical declarations to meet his burden.  These declarations, however, are woefully insufficient.  Indeed, they offer no credible evidence about the declarants' job duties, work environment, or any decision, policy, or plan common to the putative collective.

a.      **Plaintiff's Boilerplate and Conclusory Declarations Are Not Sufficient to Meet Plaintiff's Burden**

As set forth in much greater detail in Defendants' Objections to and Motion to Strike Plaintiff's Evidentiary Declarations (Defendants' "Motion to Strike"), filed concurrently with this Response, Plaintiff's declarations contain virtually identical boilerplate allegations.  As shown in Defendants' Motion to Strike, eight of those eleven declarations contain seventeen paragraphs each, thirteen of which are *word-for-word identical*, and the other three declarations each contain thirteen paragraphs, eleven of which are *word-for-word identical*.  Those cut-and-pasted declarations are filled almost entirely with boilerplate, vague, and conclusory assertions that are unsupported by any evidence.  Nowhere in any of those declarations do Plaintiff or the other declarants provide any factual basis for any of their assertions, or any evidence that they observed or were privy to how Capital One paid or treated any other person besides themselves.

Confronted with similar declarations, courts have refused to conditionally certify collective actions.  In *Songer*, for example, the Court denied certification and stressed that "boilerplate" or "virtually identical" declarations that "contain primarily conclusory allegations unsupported by

17

any factual assertions demonstrating the basis of the affiants' knowledge" are not enough to support a grant of conditional certification. 569 F. Supp. 2d at 705-07 (McBryde, J.). Similarly, the plaintiff in *Stiles v. FFE Transp. Svcs. Inc.*, 2010 WL 935469 (N.D. Tex. Mar. 15, 2010) (Boyle, J.), relied on identically-worded declarations stating that "[f]rom my experience and conversation with other employees of FFE, I know that my colleagues located in Lancaster, Texas and Newburgh, Indiana also often worked in excess of 40 hours per week and were subject to the same compensation policies and practices." *Id.* at *3. In denying conditional certification, the *Stiles* Court ruled that such evidence was "vague, conclusory, and insufficient evidence of a single decision, policy, or plan" and, therefore, insufficient to meet the plaintiffs' burden of proof for conditional certification. *Id. See also Valcho v. Dallas Cty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008) (Fitzwater, J.) (denying motion for class certification where, after limited discovery, plaintiff offered only "the bare allegations contained in her complaint and personal declaration."); *cf. Crane*, 2017 WL 2882593, at *3 (sustaining defendant's objection to statement in plaintiff's declaration that she "was told by a company representative that employees were no longer permitted to work overtime," and ruling that such statement was "insufficient to show Plaintiff's personal knowledge about the existence of other … workers who worked over 40 hours in a week without overtime compensation). If anything, the cookie-cutter assertions contained in Plaintiff's eleven declarations are even less particular and less supported than those rejected by the Court in *Songer*, *Stiles*, *Valcho*, and *Crane*.

The declarations submitted by Plaintiff highlight the reasoning behind those courts' denial of conditional certification. Among other things, the declarations baldly state that all loan officers were classified as FLSA exempt before July 2015. As detailed above, that statement is demonstrably false. Capital One never classified CLOs as exempt. The declarants—with the

exception of Eric Abner, whose tenure with the Company lasted less than one month[2]—worked

only as MLOs and have no personal knowledge of other loan officer jobs.

### b.   Plaintiff's Declarations Do Not Present Evidence of Common Working Conditions or a Common Decision, Policy, or Plan

Beyond their boilerplate and conclusory nature, the declarations submitted by Plaintiff

otherwise standout for their failure to provide any specifics.  As such, they do not present sufficient

evidence of a common policy, plan, or practice common to the putative class.

For example, the declarants state that: (1) "Capital One did not pay me overtime for all of

my hours worked in excess of forty (40) hours per week" (indicating that they received overtime

pay in some instances); (2) "Capital One told me and the other LOs that the same employment and

pay policies and procedures applied to all LOs including the same timekeeping policies" (without

specifying the policies or procedures or indicating who at Capital One told them this); and (3)

"management discouraged me from reporting all of my hours so I did not record all of the hours I

worked including overtime each week" (without indicating who in management discouraged them,

how or why they were discouraged, when or where they were discouraged, and how many hours

went unreported as a result of the alleged discouragement).

The vague nature of these statements renders them useless for showing any commonality

between Plaintiff and the other declarants, much less the putative class.  At best, the Court can

only surmise that the declarants were paid for all hours worked and for overtime in some weeks

but not others.  Indeed, members of the putative collective regularly reported and were paid

extensive overtime.  The Court must guess as to the frequency and the reasons why the declarants

were sometimes not paid overtime.  The declarations also do not attribute the alleged failure to pay

overtime to any specific practice or procedure.  They do not allege, for example, that they were

_____

[2] Abner was employed by Capital One as a CLO from April 4, 2016 to May 2, 2016.  Jordan Decl. ¶ 26.

not allowed to work any overtime, that they could only work a certain number of hours, that they performed certain tasks off-the-clock, or even that their supervisors' compensation plans incentivized them to permit or encourage off-the-clock work.

Confronted with similarly vague declarations, courts have refused to issue notice. As the Court in *Rueda v. Tecon Services* reasoned, "[t]he mere fact that violations occurred cannot be enough to establish similarity" as required for conditional certification." 2011 WL 2566072, at *3 (S.D. Tex. Jun. 28, 2011) (quoting *Barron v. Henry Cty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003)). Simply put, Plaintiff offers no evidence of any FLSA violations that "stem from some generally applicable policy or practice," and no "discussion of the specific source of the decision, policy or plan of which they complain." *Franklin*, 2016 WL 7744407, at *4.

The lack of any evidence of a common policy, plan, or practice—or even an alleged one— is particularly damaging to Plaintiff's motion in this case because of Capital One's undisputed formal and disseminated policy requiring that employees accurately record all time worked. When employers present evidence of such a policy, courts reject certification unless the plaintiff alleges that the Company did not follow the stated policy for a specific, common reason. *See Nieddu v. Lifetime Fitness, Inc.,* 977 F. Supp. 2d 686, 705 (S.D. Tex. 2013)(denying conditional certification); *Coca v. Big Bang Enters.*, 2015 WL 12532479, at *10 (S.D. Tex. April 14, 2015) (denying certification when employer had express written lawful policy and plaintiff presented no evidence of a contrary common plan).

The failure to even voice a supposed common policy, plan, or practice is even more troublesome in this case because of the diversity of the class Plaintiff proposes. He seeks a company-wide class in potentially three different job classifications working in very different geographic locations with numerous different managers. Because Plaintiff has "failed to produce

any evidence that a comprehensive, company-wide compensation scheme existed" between his own and any other Capital One facility, certification of such class is unwarranted. *Parker*, 2017 WL 1550522, at *10.

3.   Plaintiff and the Purported Class Members Had Materially Different Job Requirements and Payment Provisions

As this Court has previously ruled, "[f]or the class representative to be considered similarly situated to the potential opt in class members, the class representative must be similarly situated in terms of job requirements and similarly situated in terms of payment provisions." *Ryan v. Staff Care, Inc.*, 497 F. Supp. 2d 820, 824-25 (N.D. Tex. 2007); *see also, Crane*, 2017 WL 2882593, at *4 ("courts look to the similarity of job requirements and pay provisions. . . ."). That is not the case here.

Plaintiff seeks conditional certification of a broad class of employees defined as

All persons who are, have been, or will be employed by Defendants as "Mortgage Loan Officers" "Mortgage Loan Originators," "Senior Mortgage Loan Officer," and other individuals who originated loan products with similar job titles within the United States at any time during the last three years through the entry of judgment in this case.

Plaintiff's Original Complaint at 9, ¶ 47. The declarations he submits, however, focus almost exclusively on MLOs and demonstrate a complete lack of knowledge concerning CLOs and HEOs.

Plaintiff's submissions treat all loan officer employees as one behemoth. They were not, and the declarants cannot ignore the significant differences in working conditions and pay between the various jobs. As detailed above, MLOs, CLOs, and HEOs had very different work environments, job requirements, pay structures, and even parts of Capital One to which they belonged. An MLO's experience—with significant autonomy that entailed—did not remotely resemble that of a CLO, who worked in a much more structured and closely-supervised call center or trading floor environment. HEOs were even more different, selling a completely different type

21

of product and consisting as part of a completely different organization.

Given this diversity, Plaintiff had to submit sufficient evidence of each type of job. He, however, did not make such a showing. With one minor exception, his submissions exclusively come from MLOs. Plaintiff submits no evidence that HEOs experienced any illegal conduct or of have any desire to join the litigation. That failure, alone, proves fatal to Plaintiff's request for notice to them. *See Crane*, 2017 WL 2882593, at *6. As the *Crane* court noted in a similar situation, determination of HEOs' experiences and willingness to join the litigation would be nothing more than pure speculation. *Id.*

Plaintiff's submission concerning CLOs is equally deficient. Only one CLO, Abner, provided a declaration. Tellingly, he only worked for one month and only in Capital One's smaller Wilmington centralized office. That short time span combined with Abner's failure to allege any specific factual allegations renders his declaration useless in determining CLO working environments and experiences. Indeed, his short tenure epitomizes that the declarations' boilerplate language should not be given credence. Perhaps nothing better exemplifies the shortcomings of Plaintiff's submission concerning CLOs than the repeated statements that Capital One treated all of the putative class as exempt before July, 2015. As detailed above, those statements are demonstrably false. CLO job duties, work environments, and pay provisions simply differ too much to justify notice.

Even among MLOs, the job duties and work environments differ too much to justify a class. The only evidence of a common policy, plan, or practice provided by Plaintiff's submission concerns the exempt classification of the MLOs before July, 2015. That group nevertheless remains inappropriate for class treatment.

Determination of whether individual MLOs qualified for the outside sales exemption is highly fact specific. *See Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1156 (10th Cir. 2012); *Lipnicki v. Meritage Homes Corp.*, No. 3:10-CV-605, 2014 WL 923524, at *5–7 (S.D. Tex. Feb. 13, 2014).  It requires an individual determination of whether a particular employee's primary duty involves the making of sales while customarily away from the employer's places of business which requires a case-by-case determination based on all of the facts and circumstances. *Id.*  As little as one to two hours of work a week away from the employer's place of business can satisfy the requirement.  *Id.* at *7.

Capital One gave MLOs laptops, smartphones, and expense accounts because it expected them to be customarily away from a Capital One place of business meeting with potential referral sources and customers.  Indeed, if the declarants' uniform assertions that they primarily spoke with customers over the phone, communicated with them via the internet, or met with them in "their office" are to be taken as true, they would differentiate the declarants from other MLOs.  As detailed above, MLOs did not have a regular office, and Capital One would not have provided the laptop, smartphone, and expense account for MLOs to sit in an office.  Accordingly, the Court would have to do a case by case review of each MLO's conduct during the pre-July, 2015 period which renders that group inappropriate for conditional certification.[3]

Given these facts, Plaintiff's attempt to conditionally certify a class of "[a]ll persons who are, have been, or will be employed by Defendants as 'Mortgage Loan Officers' 'Mortgage Loan Originators,' 'Senior Mortgage Loan Officer,' and other individuals who originated loan products" must fail. Even if the bare, conclusory boilerplate in his declarations offered any support for his allegations, the overwhelming weight of the evidence would still show that vast and crucial

---

[3] This is particularly true given the United States Supreme Court's recent decision in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018), in which the Court rejected the narrow interpretation of the FLSA.

dissimilarities between the members of his purported class, such that conditionally certifying that class, even under the "lenient" standard urged by Plaintiff, would be improper. Because the evidence shows that the members of that class are not "similarly situated in terms of job requirements and … in terms of payment provisions," *Ryan*, 497 F. Supp. 2d at 824-25, Plaintiff's Motion must be denied.

4.  <u>Plaintiff Presents No Evidence of Any Employee Who Did Not Receive Minimum Wage</u>

In his motion, Plaintiff also claims that he seeks to represent a collective of employees allegedly denied minimum wage under the FLSA.  He, however, does not provide any submission, including any of the submitted declarations, that alleges that any employees did not receive minimum wage.  Accordingly, he has not met his burden of establishing that a putative class of Capital One employees who claim they were denied minimum wage exists and notice should not be provided.

**C.   Plaintiff's Proposed Order Is Objectionable**

As detailed above, Plaintiff motion should be denied.  His proposed order for notice also is objectionable.  Specifically, even if notice did issue (it should not), the relative putative collective members' names and addresses should suffice.  Courts in collective actions typically provide for notice via first class mail only.  *See Kuznyetsov v. W. Penn Allegheny Health Sys.,* No. 2:09-cv-00379, 2009 U.S. Dist. LEXIS 47163, at *17-18 (W.D. Pa. June 1, 2009) (limiting notification of collective action to first-class mail only); *Steinberg v. TD Bank, N.A.*, No. 10-CV-5600, 2012 U.S. Dist. LEXIS 89086, at *18-19 (D.N.J. June 27, 2012) (explaining that first class mail is sufficient); *Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630 (D. Colo. 2002) (rejecting alternative forms of notice where first class mailing was sufficient).  Mail, alone, will suffice in this case and limit any intrusion on the putative class members' privacy.  In addition, a sixty day

notice period would present more than ample time for any putative class member to consider joining the lawsuit.  Lastly, twenty-one days, rather than ten days, represents a reasonable time to collect and provide class contact information.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff has not met his necessary burden of demonstrating that he is "similarly situated" to any of the putative class he seeks to represent.  His boilerplate and conclusory submissions are not worthy of credence.  Equally important, they fail to provide any factual specifics, much less any evidence of a common decision, policy, or plan common to anyone in the putative class.  Accordingly, Plaintiff's Motion for Conditional Certification should be denied in its entirety.

Respectfully submitted,


By: */s/ Kevin M. Duddlesten*
Kevin M. Duddlesten
Texas Bar No. 00793644
MCGUIREWOODS LLP
2000 McKinney Avenue, Suite 1400
Dallas, Texas 75201
Telephone: (214) 932-6400
Facsimile: (214) 932-6499
kduddlesten@mcguirewoods.com

W. Joseph Miguez
Texas Bar No. 24037107
MCGUIREWOODS LLP
816 Congress Ave., Suite 940
Austin, Texas 78701
Telephone: (512) 617.4524
Facsimile: (512) 617.4582
jmiguez@mcguirewoods.com

Christopher M. Michalik
Virginia Bar No. 47817*
Elizabeth P. Redpath
Georgia Bar No. 979358*
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone:  (804) 775-4343
Facsimile:  (804) 225-5411
cmichalik@mcguirewoods.com
eredpath@mcguirewoods.com

**ATTORNEYS FOR DEFENDANTS
CAPITAL ONE HOME LOANS LLC and
CAPITAL ONE NATIONAL ASSOCIATION**

*Admitted *pro hac vice*

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2018, the foregoing document was duly served in accordance with the provisions of Rule 5 of the Federal Rules of Civil Procedure as follows:

***Electronic Case Filing***
J. Derek Braziel
LEE & BRAZIEL, LLP
1801 N. Lamar Street, Suite 325
Dallas, Texas 7522

***Electronic Case Filing***
Rowdy B. Meeks
ROWDY MEEKS LEGAL GROUP
8201 Mission Road, Suite 250
Prairie Village, Kansas 66208

*/s/ Kevin M. Duddlesten*
Kevin M. Duddlesten